Good morning, Your Honor. Daniel Petruccelli for Appellant, Hollywood Foreign Press Association. I'd like to reserve five minutes in rebuttal. Certainly. The District Court interpreted twelve words in this 1993 short-form amendment to give DCP complete control over the broadcast rights to the Golden Globes, even though the HFPA is the creator and owner of the Globes, has been putting on the show for over 70 years, owns all the broadcast rights to the shows and relies on those broadcast rights for its existence. According to the District Court's construction of the agreement, it's DCP and DCP alone who gets to decide whether and on what terms HFPA's Golden Globe show will be broadcast by NBC. And DCP gets to do that unilaterally, working with NBC, but with no input, no approval, no authorization from HFPA and even over its vigorous consent. Now, there are two problems with this interpretation, and I really am going to spend my precious time this morning focusing on the second one. But just to identify what the first is, under either a plain language analysis or even with the assistance of the facts found by the Court, the Court misconstrued this 1993 amendment to provide not only for the eight specific option years ending in 2005 to DCP to produce this show, but it also went on to construe this to provide an unlimited number of additional option years, potentially in perpetuity, provided that DCP can convince NBC to extend their broadcast agreement to broadcast the show. And I believe that that's contrary to the plain language of this agreement. The agreement says no such thing. Is that your problem number one? That's your problem number one. That's the first one. Okay. What's your problem number one? The second one, which I think is a more fundamental and glaring issue and is really the easiest and most direct path to reversal because the judge made a fundamental legal error here, is this. The agreement goes on to say, and the way the Court interpreted it, that DCP gets those additional years potentially in perpetuity for any extension of the NBC agreement. But there first must be an extension of the NBC agreement in order for DCP to have those additional years. And the question is, who has the right and who has the authority beyond the specified term of 2005 to enter into those extended broadcast agreements with NBC that are beyond the term of the agreement? Well, that's my question for you. Whose understanding or intent matters with respect to that? Is it the understanding of each of the 80 HFPA members matter? Is that what you're trying to argue or only that of the majority? No. The first point I'd like to make, and then I'll talk about the issue of intent, is that just on the plain language and putting aside any of the fact findings and putting aside the extrinsic evidence, just on the plain language, the Court indicated in its ruling, and this was the sole basis for this ruling, that because this clause does not say that HFPA has the authorization or has the right to authorize continued broadcast of the Golden Globe, because those words are missing, the Court construed the agreement to mean that DCP has the right to enter into these broadcast agreements unilaterally without HFPA's involvement or consent, even though HFPA is the rights holder. And that's the significant legal error that the Court made, because the question is not where is the language authorizing HFP. The question is where in this agreement is the language authorizing DCP. Well, it says that the NBC agreement is referred to in the paragraph above. And that's an agreement between DCP and NBC. Made expressly with the authorization of HFPA, the rights holder. That's correct, Your Honor. And so what this agreement developed as a result of a meeting, and this is all in the findings of facts, so I'm not arguing the facts, I'm embracing them, where DCP came to the HFPA and said, we want your approval of this exact NBC broadcast agreement that we will go out and finalize if you will approve us to do so. After discussing the agreement and how long that it would last, as few as three years and as many as ten years, they said, we approve. The HFPA approved. And it was on that basis that DCP then executed that agreement. But it required, just like every other prior agreement required, the HFPA's consent and authorization to these broadcast agreements, and that's expressly in the judge's findings of fact. Then the finding of, I'll give that to you right now. That's finding of fact 15. Thank you. Let me correct that because I'm just getting a little bit, oh, here it is. It's finding of fact 7, but it's on excerpt of record ER 15. Okay. And so because the membership had approved this specific grant, license agreement, I should say, the membership then went on to give DCP the exact number of additional option years that it would need to fulfill this NBC agreement. Excuse me. Let me go back to this. Finding of fact 7 says the principal terms of every production agreement. Is that the finding? You get that, Your Honor. Okay. The site I gave you was page what? 15. ER 15. ER 15. Okay. It doesn't say anything about the NBC agreement. There's another one on that, and I'll have to locate that for you. But the evidence on that is not in dispute that every one of those prior broadcast agreements was brought to the HFPA and approved by the HFPA. And I will try to locate those. If you don't have it before, you can do it. Yeah, I will try to locate those citations for you. But just to be clear, Your Honor, there were before this NBC agreement, which was expressly approved by the membership on September 22, 1993, there were two other network deals, both with Turner, both cable network deals, one in 88 and one in 89, and they were both brought to the membership, and the membership approved it.  And so there's a prior the prior history was that every one of these had to be approved. And so the problem that we have with the court's analysis here is that the court said that DCP not only has these rights potentially beyond 05 if there's an NBC extension, but also said that DCP can go on and do these extensions on their own. And the court had it exactly backwards because there has to be specific language here that HFPA, as the rights holder and the grantor, is giving that right to DCP. Absent giving that right away to DCP, that right remains with HFPA. If I could just beg your indulgence on this, because this is the clearest and most important point. I think it's important to understand the error of the Court's interpretation beyond all the arguments that we have made. If this paragraph here, this paragraph containing the extension clause, and I'm looking at the 93 amendment, which is ER 974 and 975, and I have extra copies if you're asking me. I think we have the amendment. If you just take a look at this, it starts out in the granting paragraph after identifying the NBC agreement, and it says that it's giving DCP eight specific options to produce the show for the years 98 through 2005. And the reason why it gave eight is DCP already had, under the prior agreement, been given two. So now with the additional eight, it had ten. Ten was the exact number needed to carry out this NBC deal that the membership had approved. The NBC deal could go as little as three years or as many as ten, NBC having options. Now, let's just suppose for the moment that this, what we've been calling this extension clause, is not contained in this agreement. That's the wording. Sotomayor, which agreement? This is the 93 amendment, forgive me. Yes. If the extension clause were not in here, there would be no dispute by anybody in this case that DCP would have the right to unilaterally enter into a broadcast agreement beyond 2005, because absent the extension clause, this agreement has a firm end date of 2005. Not even DCP suggests that it could, in year 2004, for example, go off and do a 120-year broadcast license with NBC, because they would only have one more year of rights. Now, let's put the extension clause back into the document, where it now appears. And let's assume that DCP is correct and the district court is correct on the first issue for the moment, and that if and when there's an extension of this NBC license beyond 2005, DCP remains attached. That is, DCP gets to be the producer if HFPA decides to continue to have NBC broadcast the show after 2005. That was their whole argument, why this extension clause should be read to confer rights beyond 2005, because they said, we brought you NBC. We don't want to be cut out of the deal. If you do a deal with NBC, we want to be a part of it. And their position is, we want to be a part of it, whether it's before 2005 or after 2005. And the judge accepted that view of the facts. And we accept that for purposes of this argument. Nowhere in there, however, does it say that in the extension clause that DCP can exercise the authority on its own to go out and execute those additional broadcast licenses. It just means that if HFPA authorizes DCP after 2005 to go out and do so, HFPA must deal with DCP. It cannot cut DCP out of the equation. It can go to CBS. It can go to ABC. It can go to Fox. But if it wants to do business with NBC after 2005, DCP remains attached to the property because they sourced the deal. So you have to go through them, either play them or pay them. But either way, they're going to be involved. That's what this means. Now, DCP recognizes the issue, Your Honors, because in their briefing, even though the judge did not rely on this reasoning, the DCP says, well, the right to do broadcast licenses is found in paragraph 7 of the underlying agreement, even though paragraph 7, of course, appears. There's no mention of paragraph 7 in this page-and-a-half amendment, although to be clear, the amendment says all other terms of the agreement remain in effect. So if you go back to paragraph 7 of the underlying agreement, that doesn't solve the problem because that paragraph says that DCP has certain rights to do things during a period when it has rights to produce, during a pending term of its agreement with HFPA. When nothing in paragraph 7 allows DCP to extend the deal into the future, nothing in paragraph 7 grants DCP future rights. Paragraph 7 only applies to the rights that DCP has with respect to the productions that it makes during the term of the contract. So what the court fundamentally missed here is that even though HFPA is the property owner, the rights holder, and owns all these rights, it said unless the contract says that HFPA must authorize future extensions of the NBC license agreement, by default, therefore, DCP has those rights, and he's got it exactly backwards under the law. And that is just a clear legal error. And if you look at the basis of his findings, Your Honor, is on ER 77 and 78 in the conclusions of law, he says, absent is any language requiring HFPA's consent, but absent is any language authorizing DCP to enter into these license agreements after the end of the term. The way this works, Your Honor, is that this agreement comes to an end in 2005 unless there's an extension of the NBC license beyond 2005. But how does that extension come to pass? The rights holder has to authorize it, just as it did in every prior agreement. DCP can't run off and execute a license agreement tomorrow for the next hundred years with ABC and tie up HFPA's show, but that's exactly what the district court held. And his conclusion of law is as follows. We said HFPA's approval is required, and he said that interpretation is untenable because it would require the contract to be construed as if it contained language requiring HFPA's approval, and it does not. Excuse me. What page are you reading from? I'm reading from ER 88, which is conclusion of law 77. He goes, therefore, HFPA's interpretation is contrary to the settled principles of contract interpretation, citing a California State case. What that case talks about is the well-known proposition that you can't read an additional term into a contract. You can't use extrinsic evidence, for example, to smuggle in an interpretation that would change or vary the meaning of a contract. You can only use extrinsic evidence to explain the term of a contract. But again, the judge has it exactly backwards because absent an express grant to DCP by HFPA that you have the right to go off and authorize new license agreements at the end of our term, then that right remains with the rights holder. And, you know, if you look at any intellectual property case, a copyright, trademark, patents, whatever, they all say that all the rights inherit with the owner unless they're expressly given away. And giving a DCP credit on the first issue, that they have option years beyond 05, if you read the extension clause, it says those option years are for any extensions, renewals, substitutions, or modifications of the MVC agreement. It doesn't go on to say which DCP shall have the express right and their sole discretion to continue or to enter into. So we have a glaring error. Well, there appears to be a dispute over the standard of review. So which of the district court's findings do you believe that we can review de novo? Well, first of all, the entire argument that I have just made right now is a plain language argument that is review de novo. It doesn't require any reference to extrinsic evidence. This is a plain language de novo review which everyone agrees this Court must conduct because at the end of the day, contract interpretation is a judicial function subject to de novo review. As to fact findings, Your Honor, those are entitled to deference under the clearly erroneous standard. However, just to be clear, the application of contract principles to those facts, in other words, how those facts inform the Court's interpretation, is a matter of contract interpretation for de novo review. We don't challenge any of the facts. We accept all of the findings of fact. Including that Ms. Van Blaricombe was credible? Yes. And exactly. And let me turn exactly to that because once you once you So you do you concede that she was credible? Well, we're not challenging the judge's determination that she was credible for purposes of making these arguments and for seeking the reversal. But I would like to direct your attention on that to finding of fact 67, okay? And this is why I have directed the Court's attention to this issue of authorization because when you look at – I just went through my plain language analysis and I submit that the judge was just wrong on flipping his analysis on us. But beyond that, when you start looking into the record, look at this is an area where the findings of fact overwhelmingly corroborate and support the interpretation that even if DCP has rights into the future and are attached to any MDC deal, HFPA's authorization is required in order to effectuate those deals. Fact number 67, LeMena, that's the DCP negotiator, also admitted he never discussed with Van Blaricombe the actual words of the so-called extension clause in the 93 Amendment and here's the critical part. Nor did he disclose that under his view, DCP would have the unilateral discretion to extend, renew, substitute, or modify the broadcast license with NBC on whatever terms and for whatever duration it deemed appropriate without HFPA's knowledge or participation and even over HFPA's strenuous objection. And then secondly, if you just look at the finding of fact about what Mr. LeMena actually told the membership when he obtained approval of this amendment, Mr. LeMena said, and this is at ER 994, he said that these deals are always subject to your approval, always subject to your approval, talking about the deals with the network. And that's at ER 994. And in addition, if you look at fact finding 39. You're out of town. Let me just ask you one question. What if we disagree that the extension clause is a second condition that must be satisfied for DCP to have the option to produce the show between 98 and 2005? What's your argument then? I'm not sure I understood the question. There's two. Yeah, the first argument is that we don't believe the extension clause gave DCP option years beyond 2005, because it's very specific. It says eight options. And we believe that the extension clause was intended to protect DCP's relationship with MVC during the ten years ending 2005. Now, the judge rejected that argument and said, no, I find that it's a source of options to DCP upon, beyond 2005, upon any extension of the MVC license agreement. And so our next argument was, well, even if you agree with that proposition, obviously the extensions of the MVC license agreement, which would thereby extend DCP's agreement with HFPA, must require authorization from HFPA. Otherwise, DCP essentially owns the broadcast rights with MVC forever. And they can never be taken to market again. They can't go to any other broadcaster because MVC knows that DCP can only deal with MVC and that they're the only game in town. If DCP can only continue in this relationship with HFPA under its interpretation by continuing the broadcast license with MVC, it can't take it anywhere because it automatically loses its rights. So it's one thing to say, okay, if we want to continue to keep the show on MVC, we get it. You, DCP, either have to be the producer or you have to be paid for however long we continue with MVC. However, that protection that you were afforded by that extension clause certainly doesn't mean we can't take our show elsewhere, certainly doesn't mean we can't put it out to market to the highest bidder. We are now a hostage to this interpretation. And we've laid out all the arguments in your briefing. I know that I've gone beyond my time, and so I'll sit down right now. But this fundamental error where the judge said the missing language counts against us is reversible error. The missing language counts against them. Thank you. Thank you. I think I can now safely say good afternoon. Marty Katz from Shepard Mullen on behalf of the defendants below. The parties had their day in court. There were many, and I want to emphasize many, hotly contested factual issues, factual issues that impact both Argument 1 and Argument 2, the approval issue that Mr. Petrucelli focused on this morning. One of the things that is most challenging for a trier of fact and a district court judge interpreting a contract to do, especially in a case like this where there is a rich history, 30 years of rich history of surrounding circumstances, drafting and negotiation process, communicated intent, post-contracting conduct that reflects the intent of the parties, and industry custom and practice. One of the most challenging things to do is to roll back time and to view things not in today's light as people know the Golden Globes today, but to put themselves back at the time that all of those events occurred, back in 1983 when the show was on the brink of extinction, back in the late 80s when Dick Clark Productions brought the show from extinction onto a national cable network, and then in 1993 when it secured the deal with NBC, each time seeking end-of-the-deal protection, something that is routinely done in the entertainment industry, as the district court found, so that you don't invest your time, your money, and your resources here at a loss by Dick Clark Productions for many years, and then find yourselves cut out of the deal when the brand, as a result of your hard work, becomes far more valuable. The district court's opinion spans 89 pages, as you know, 170 findings of fact that followed a two-week trial, 19 witnesses, and over 450 exhibits, and we hear today that all of the findings of fact are undisputed, including the one that was challenged in the papers. HFPA makes no challenge to the trial court's evidentiary rulings, no challenges to the findings of fact, and wants to persuade the court, solely now on a plain-meaning interpretation, that it is correct. But this was a case that was rich in extrinsic evidence, and the court's interpretation, both its analysis of the plain meaning, because of PG&E versus Thomas Dreyage, and all of its progeny that says you can't look at the plain meaning without looking at extrinsic evidence first provisionally, and then admitting it if it's relevant, which is precisely what the court did here. You can't make that plain-meaning determination in a vacuum. You must make it based upon the extrinsic evidence. And when that occurs, and because that occurs, the standard of review on appeal is clearly erroneous standard. And that we would submit that defendants win no matter what the standard of review is. But on a clearly erroneous standard, there isn't even a case here. You don't even hear opposing counsel mentioning the extrinsic evidence in support of the defendant's position. What was clear to the district court was three things. One, throughout the relevant time period, all of the surrounding circumstances in rich history, Dick Clark Productions sought end-of-the-deal protection. Why? Because it didn't want to be the victim of its own success, taking a brand on the brink of extinction, polishing it, turning it into the crown jewels, and then being cut out of the deal. In 1983, when the first deal was done, it secured four options on top of the initial show, but received no other end-of-the-deal protection. In 1987, it obtained rights of first negotiation and first refusal. In 1989, in addition to extending those rights of first negotiation and first refusal, it obtained two extra options. And then in 1993, when the dream of both sides, the objective that had been dreamt about for ten years, getting the show back on the network, it obtained an additional end-of-the-deal protection that it couldn't be cut out so long as the show was on NBC. As Mariana Von Blairacom testified, it was like till death do us part. When we asked you about her as a witness, it seemed to me she was an extraordinarily unreliable person to rely on. Do you have any better witnesses? Well, I think that the district court found a couple of things about credibility. It found that HFPA's President LaMena, who expressed the DCP side, was the single most credible witness in the case. With respect to Von Blairacom. I asked you about that, yeah, but testimony at this point, you cited Von Blairacom. Anybody else? As for Von Blairacom, the district court performed its function. It weighed credibility, it weighed bias, and it pieced together 450 exhibits and how it looped together with her testimony. It looked at the fact that she obtained legal advice from one of the most well-known and well-respected entertainment lawyers in Los Angeles before signing the 1993 amendment, and her testimony that she knew precisely what it meant and that she explained it to the membership. Corroborated by a mountain of other extrinsic evidence. In particular, she was the only witness from the Hollywood Foreign Press on this point. But there were numerous documents that supported her view. For example, in 2001, when the NBC agreement could be renegotiated, this was the 10-year, $100 million deal, hotly disputed fact on the table was whether or not HFPA gave its approval, because that's the approval point that Mr. Petrucelli made this morning, whether or not HFPA gave its approval to the 10-year deal. HFPA contended at trial that there was an unrecorded vote, unrecorded in its minutes, and that it approved. The district court properly rejected that. It concluded that that was not reasonable and that, in fact, what happened is that Dick Clark Productions made a, quote, informal presentation, did not seek approval, and no approval was given. Rather, Dick Clark congratulated the board. True enough, the district court finds that, in essence, it gave de facto approval after the fact. It accepted it, which was what Mr. LaMena testified is what he was seeking in the first place, endorsement and support, but not approval. And one cannot equate trying to get the endorsement or the support of a business partner with legal approval when there is none. There was other extrinsic evidence on the approval point. In 2002, LaMena, the DCP negotiator and president, writes a tickler to himself, to the file, that nine years later, DCP should exercise options again. Not seek approval, but exercise options. That's finding of fact 119. What I think most telling is what happened in 2002, a year later. A year later, then-president of the HFPA, Dagmar Dunleavy, decided, and she was the one that was president when the exercise of options was done in 2001 with the deemed extended language, drafted by HFPA's lawyer, that any extension of the NBC agreement that the DCP options are deemed extended for any extension of the HFPA, of the NBC agreement. A year later, she has a change of heart. And she concludes that the starlet has become a star and the agreement is no longer fair. HFPA blatantly repudiates the agreement in attempt to renegotiate. This is set forth in findings of fact 120 through 130. After HFPA withdraws the repudiation, there is a meeting between HFPA and DCP, at which point former president of the HFPA states, you have it, meaning you, DCP, have it, till 2005 or as long as NBC wants it. No suggestion of, but only if we approve it. And then there are numerous admissions throughout the 2004 to 2010 period found in findings of fact 131 through 140. And so I get back to the point I was making, that it was clear that DCP was striving for end of the deal protection, that it could not be cut out. And this approval argument that is now made at the 11th hour would, in fact, vitiate all of that end of the deal protection, because what would HFPA say? We don't approve any extension with NBC. Now, why would they do that? Well, when Dick Clark Productions took over production and distribution, and by the way, it had full rights to distribute without HFPA's approval under paragraph 7 of the 1987 agreement. In fact, in paragraph 9 of the 1987 agreement, all that Dick Clark Productions had to do was give a copy of the license agreement to a designated representative of HFPA for informational purposes only. There is another paragraph, paragraph 10 of the 1987 agreement, that does have an approval requirement in favor of HFPA, but that's only for publicity. So they knew how to say when HFPA has approval, but they didn't have approval over distribution and exploitation rights. And I will note that in the reply brief filed by the HFPA, on page 22, where they quote the relevant portion of paragraph 7, they italicized the wrong language. It is the prior sentence, which is the relevant language, and that the district court found was the relevant language. Okay. Why would the HFPA want to not approve the NBC agreement? If they – why would they want to cut us out at this point? When Dick Clark Productions took over in 1983, the average annual license fees that it was able to garner in syndication was a couple hundred thousand dollars a year. It escalated to $1.2 million average annual license fees when Dick Clark was able to put it on TBS, on cable. It escalated to $3.4 million per year when it entered into the first NBC agreement. It escalated to $10 million a year in 2001 when Dick Clark Productions did the 10-year extension with NBC. A year later, the light bulb goes off. It goes off at HFPA that splitting $10 million, maybe they could do better licensing it to somebody else for $8 million and cutting Dick Clark Productions out of the equation. So they try and renege on the deal. They get called on the carpet by it. That's when they make the admission that you have the rights, you, Dick Clark, have the rights as long as NBC wants it. And then, of course, in 2010, the annual average – the average annual license fees are $21.5 million a year. So, again, you can see the financial motive, as the district court did, for HFPA wanting to cut Dick Clark out of the equation. So DCP was astute to obtain what parties frequently obtain in the entertainment industry, which is end-of-the-deal protection. And, in fact, we know that DCP's fears were real. Another way to word it or to look at it, and I think it's what HF – the Hollywood Foreign Press is saying, is that if we follow your interpretation of the 1993 agreement, it gives DCP the rights to produce the Golden Globes indefinitely, if not technically in perpetuity. And it seems like, critically, there's nothing HFPA can do to get out of that agreement. It seems like it has no power to terminate the contract. And my question for you is, why then is that not effectively the type of perpetual agreement that California law disfavors? Well, first of all, rights owners all the time give their rights, grant rights in perpetuity to producers. No movie would get made – very few movies would get made – if the authors of books didn't grant the rights to their books to the studios in perpetuity so that they could exploit the property. It happens all of the time. And there isn't a special rule, truly, of contract interpretation in California that says that those types of agreements are interpreted different, that the rules set forth in Bank of the West and Wolf v. Walt Disney Pictures and Genentech apply differently. In fact, Genentech, it did involve an intellectual property license. But what I would say is that if it's not in perpetuity, if it's not in perpetuity, and the district court weighed that argument and rejected it in light of a mountain of extrinsic evidence, that ruling was not clearly erroneous. Why? Because if you – you have to look at what the purpose of an option was in the extensions clause. It was to make sure that Dick Clark Productions would not get cut out of the equation so long as NBC wants it. And that actually is the words of the HFPA witness in the document in December 2002. You have it so long as NBC wants it. Now, that's not in perpetuity. California law is very clear that that is a grant of rights for indefinite duration and is not construed as a perpetual agreement. So I think you have to look at what the objective was. Remember, the objective here was not just to get the show on a network. It was to maintain it on a network. Three times in the past, the show had been on a major national network and the networks had canceled it. And the district court specifically finds that what the membership and the president of the HFPA were interested in was not so – it wasn't how do we get out of this deal with Dick Clark down the line. It was how does Dick Clark keep us on the network for as long as it can because the testimony was we have nothing at this point. We need to get back on the network and we want to be maintained on the network. That was the shared objective. And that was why Dick Clark Productions produced the show at a financial loss for a long-term investment that it would reap benefits hopefully down the line if it succeeded in maintaining it on the network. If I understand HFPA correctly, it seems like it's arguing also that your interpretation of the extensions clause renders part of the 1993 agreement the clause that specifically granting eight options meaningless. Why is that argument faulty or ineffectual? The eight options were granted outright, no qualification. That meant that if NBC did not exercise its first or second option under the NBC license, Dick Clark Productions still had extra options to go shop it in the marketplace. Precisely the same way that it did when it entered into the 1989 amendment with the HFPA and got two extra options. Remember Mr. Petruccelli talked this morning about when they did the 1993 deal, Dick Clark had two extra options. Why? Because it had delivered on TBS, it got five extra options, three sufficient to fulfill the TBS agreement, and two that were open. Same thing is the argument at the eight. The eight were necessary. And see, HFPA's argument is, is that the eight only applies to NBC and therefore the extensions clause, one of the clauses becomes meaningless, I guess the grant of eight. Not true. The eight is unqualified. It was, Dick Clark Productions had those options irrespective of what happened through 2005. It gets the extensions clause because it needs the extensions clause for an extension, renewal, substitution, or modification of the NBC agreement. Now, that is confirmed because that language cannot be read in a vacuum. In addition to the mountain of extrinsic evidence about it, it must be read in the context of paragraph 1A of the 1987 agreement, which is the right of first refusal and first negotiation and first refusal, and the extension of those dates in the 1993 amendment. Rather than extending the rights of first negotiation and first refusal through 2005 and stopping there, as the parties did in all of the prior deals, it says those rights are extended until 2005 or until the date of the last NBC agreement, whichever is later, whichever is later. The only way that you can get to that whichever is later is if the extensions clause provided options beyond 2005 so that each clause has meaning and that DCP can exercise those options to extend the NBC agreement without HFPA's approval. Now, that's the linguistic argument. In fact, I think that as we point out in our brief, the linguistics of HFPA's argument doesn't even make sense, both on the extension of the right of first negotiation and first refusal and the second clause of the extensions clause. But again, we have to look at it in the context of the mountain of extrinsic evidence as to what the purpose, objective, communicated intent, post-contracting conduct considered under California law to be particularly compelling evidence of the intent of the parties, as well as industry custom and practice. I mean, after all, Dick Clark Productions had extensions clause in its own talent agent agreements with its own talent agencies. It had obtained perpetual rights without any approval by the rights owner in the And the trial court weighed the importance of each of those 170 facts, trying to assess which one was more important than the next. And when you have that situation, the standard of review under a number of Federal authorities is clearly erroneous. Thank you. Thank you. Thank you, counsel. I'm going to try to answer some specific questions. Judge Mergui, in response to the question about perpetuity, the Court found that both experts agreed at ER 41, and this is finding of Fact 71, quote, both sides' experts testified that they have never seen the extension clause or language like it used in a television contract or other contract for the purpose of granting additional potentially perpetual options or rights to produce a television program. This is unprecedented. When Mr. Cass was describing how you can grant a copyright interest in perpetuity, this wasn't a license to grant a copyright interest, or this was a, we hired them to produce a show that we owned, and now they've, they've arrogated the rights, and we've lost complete control over the broadcast rights. Well, there's no acknowledgment on your part, though, regarding the circumstances at the time, which I think the district court could take into consideration, but I'd like to hear you speak to this. It seems, though, at the time that Mr. Katz's characterization is probably correct, that the Golden Globes during this period is not the Golden Globes of today. They were, it seems like, making extreme efforts to try to get a network to show the program, and so how much does that affect how the district court acts? We never disputed that, Your Honor. What that, that's the so-called end-of-deal protection, and that's why the evidence established that a provision used in talent agency agreements was taken by their lawyer and put into this contract, the 93 Amendment. That's called the extension clause. What that does is that protects them in case we decide to make our own separate deal with NBC and try to cut them out. The logic is that I sourced the deal for you. I brought NBC to the table, so if you are going to use NBC to broadcast the Globes, I need to be involved, I, DCP. You, if you construe the first part of their argument that this extension clause gives them rights beyond 2005 to produce the show, they have absolute end-of-deal protection because it means that we can't cut a deal with NBC around them. We have to go through them. But they're taking it to a whole other level that was never discussed, which is we not only want to protect NBC, but we don't want you to be able to go anywhere else. What would protecting the NBC deal, which was the purpose of the extension clause, have to do with preventing us from going elsewhere? If I could give you a perfect analogy. That's fine. Thank you. Well, in the talent agency context, if a talent agent puts Jerry Seinfeld in the show and Seinfeld re-ups to do another episode or two of the show or another season, the agent still gets commissions because he put Seinfeld in that show. But they're taking that extension clause to say that Seinfeld can't go work anywhere else. That's number one. And number two, that now the agent can go and sign a new deal with the show to force Seinfeld to work. They're making broadcast deals when we have to put on the show that's going to be broadcast. Your Honor, finally, in answer to your question about the prior agreements of the network licenses, those appear at fact finding number 24. That's the 1988 network license with TBS and also ER1104, the minutes reflecting that approval. The next network deal was 1989, TBS a deal again. Fact finding 25 and 27 at ER20 to 21. The third one was the 1993 MBC agreement, the one that's referenced here. And there's no dispute that that was submitted and approved by the membership. And that's at findings of fact 36, 38, and 53. And then finally, the last one, well, the next to last one was in 2001 where the court found that while HFPA's procedures were not rigorously followed, HFPA was wildly enthusiastic about the 2001 extension and gave de facto approval. And that's at fact finding number 90 and 103 at ER46, 47, and 51. To be clear, the first and only time ever that DCP entered into a network license agreement without the full support and endorsement and consent of the HFPA was in 2010 when it did so behind our back, telling us that they would not do so. That's a finding of fact specifically. But then it went ahead and did so anyway. And then we immediately filed suit. There has never been a history of DCP entering into network license agreements without us. And I submit that is the essential flaw in the judge's reasoning that it's one thing to say they can remain attached to the MBC relationship going forward. It's another thing to say that they can unilaterally authorize all sorts of future deals with MBC for our show without our consent, our authorization, and even against our will. That is unprecedented in the words of both experts. Thank you. Thank you, counsel. Thank you both very much. The case just argued will be submitted. Court will stand in recess for the day. All right.
judges: REINHARDT, NOONAN, MURGUIA